IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLINTON BRIAN WILSON, | No. C 09-0143 MMC (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK** |
| v. | |
| GARY SWARTHOUT, | |
| Respondent. | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Clinton Brian Wilson, challenging the validity of a judgment obtained against him in state court.[1]  Respondent has filed an answer to the petition.  Petitioner has not filed a traverse.

## I. PROCEDURAL HISTORY

In 2005, a San Mateo County jury found petitioner guilty of robbery with personal use of a firearm, possession of a firearm by a felon, burglary of a vehicle, and possession of stolen property.  (Ex. 1 at 505-11).[2]  The trial court sentenced petitioner to a total term of 15 years and eight months in state prison.  (Ex. 1 at 569-70).

---

[1] Petitioner initially named James E. Tilton, former Secretary of the California Department of Corrections and Rehabilitation, as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Gary Swarthout, the current warden of California State Prison - Solano, where petitioner is incarcerated, is hereby SUBSTITUTED as respondent.

[2] Unless otherwise indicated, all references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

On September 21, 2007, in a reasoned opinion, the California Court of Appeal affirmed the judgment. People v. Wilson, 2007 WL 2751877 (Cal. Ct. App. Sept. 21, 2007). On December 19, 2007, the California Supreme Court summarily denied the petition for review. (Resp.'s Apr. 16, 2012 Mot. To Dismiss ("MTD") Ex. 2.)

On June 13, 2009, petitioner filed the initial petition in the instant action, which petition contained two claims alleging trial court error. Petitioner thereafter sought and was granted a stay to exhaust in state court a claim alleging ineffective assistance of counsel. (Dkt. No. 16.)

Petitioner next filed petitions for a writ of habeas corpus in the California Superior Court, Court of Appeal, and Supreme Court, all of which were denied. (MTD Exs. 3-5.)

On June 14, 2011, petitioner filed in the instant action an amended petition containing all three claims for relief. By order filed July 5, 2012, the Court granted respondent's motion to dismiss the new claim as untimely and directed respondent to file an answer to the two remaining claims. (Dkt. No. 40.)

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

***Bank Robbery-July 10, 2003***

At about noon on July 10, 2003, Paula Pacis was working as lead teller at a San Mateo Wells Fargo Bank (San Mateo bank). She noticed two African-American men enter the bank through the rear door and approach her teller window. One man (later identified as [petitioner]), wore a black fisherman's hat and blue shirt with "security" written on it in white letters; the other (later identified as Burtley) wore a white t-shirt, black baseball cap and black pants. [Petitioner] put his hand, covered by an envelope, on the counter, told Pacis she was being robbed and demanded she give him money. He removed the envelope to reveal a small white handled (sic) handgun pointed at her, and told her to give him her "hundreds and [fifties]." Burtley was standing next to [petitioner]. Pacis complied with the demand and placed the hundreds and fifties from her bottom drawer on the counter.

After Pacis placed the money on the counter, Burtley told [petitioner] he wanted all the money. [Petitioner] then told Pacis to give him the twenties. Pacis put all the money in her top drawer on the counter while the gun remained pointed at her. The twenties contained a dye package marker. Burtley told her she would be "okay" and he and [petitioner] walked out the bank's rear door. Pacis pulled the bank's alarm and told two coworkers she

had been robbed. Pacis calculated that $2,400 had been taken in the robbery.

Pacis met with FBI Agent Pete Adduci the following day, and, on July 13, 2003, he showed her two photographic lineups. In the first lineup Pacis identified a photo of [petitioner] and said he was the person who robbed her. In the second lineup Pacis did not recognize anyone as the robber who held the gun or the robber's accomplice.[3] Adduci also showed Pacis a gun which she identified as that used in the robbery. At trial, Pacis identified [petitioner] as the man with the gun and Burtley as his accomplice.

Contractor John Caropepe and carpenter Kevin Kerns were working at the San Mateo bank at the time of the robbery. Caropepe and Kerns noticed a reddish late model Mustang convertible with a tan top, drive through the bank parking lot with two men inside. One of the men wore a dark fishing-style hat and a blue shirt with white stenciled letters. About 10 or 15 minutes later, Caropepe saw the man with the hat and a shirt saying "security" walk by with another African-American man, walking toward the bank's door or ATM. A couple minutes later, Caropepe saw the same two men running past the bank window and down the street, and heard a bank teller tell the bank manager she had just been robbed. Caropepe and Kerns went in pursuit of the two men and found an exploded dye pack and some money in the street.

### *Automobile Burglary-July 12, 2003*

Mark Dahl testified he drove his Ford Tempo to Antones Bar in San Mateo on the afternoon of July 12, 2003. He left his red Marlboro fanny pack on his car's front seat underneath a vest, locked the car and went inside the bar for lunch. The fanny pack contained various items including Dahl's wallet, checkbook, passport, and various receipts. At about 2:00 p.m., he discovered his car had been broken into, the front passenger window was broken out and his fanny pack was missing.

Bartender Sandra Tipsword and her friend Bruce Hollingsworth were at Antones Bar when they heard the sound of glass breaking. Hollingsworth and Tipsword went outside and saw two African-American men walking across the street and a car with its window broken out and glass on the ground. When Hollingsworth yelled "hey," the two men looked at him and started running toward an alley. Hollingsworth and Tipsword said one of the men wore a dark fishing-type hat and a shirt that said "security." The other man wore a light colored, or white shirt and a hat with the visor turned backwards. Tipsword called 911 and chased the two men into the alley. She said she was "really scared" because she did not know if the alley had an outlet. Inside the alley, a silver or white car backed up toward Tipsword and drove down the alley.

On July 18, 2003, Tipsword and Hollingsworth were each shown photographic lineups. In one lineup Tipsword circled [petitioner's] picture and said she was 30 percent sure it was one of the men she saw. In the other lineup she circled Burtley's picture and said she was 30 percent sure he was one of the men she saw. Hollingsworth also selected [petitioner's] picture as the man he saw in the

---

[3] The parties stipulated Burtley's photograph was included in the second photo lineup shown to Pacis.

3

fishing hat and "security" shirt. In the second lineup he circled Burtley's picture as the person wearing the light colored shirt.

Pacis, Tipsword and Hollingsworth attended a live lineup on August 8, 2003. Each selected the person in the number one position, although it was stipulated that [petitioner] was in the number three position in the live lineup.

At trial Tipsword and Hollingsworth said photos of [petitioner's] car looked like the car they saw in the alley. Hollingsworth identified defendants[4] as the two men he saw on July 12. Tipsword identified defendants as the men she saw following the auto burglary and was certain of her identification.

*Defendants' Arrest-July 12, 2003*

At about 3:00 p.m. on July 12, 2003, Rocio Sandoval was working as a teller at a Palo Alto Wells Fargo Bank (Palo Alto bank). She noticed two African-American males loitering outside the front of the bank for about 20 or 30 minutes, looking into the bank, which aroused her suspicion. Sandoval, who was aware of the San Mateo bank robbery, notified acting bank manager, David Prasad, who told her to call police. Prasad then walked toward the door of the bank as the two men entered. One of the men wore a white t-shirt, blue jeans and a hat or visor, and the other wore a dark blue or black t-shirt with "security" written across it and a fisherman's hat. The man with the "security" shirt was holding a piece of paper. The men stood in a teller line looking around and appeared nervous or confused. After reaching the front of the teller line, the men left the bank without going to a teller window or making a transaction.

Prasad testified that when he went outside to contact the two men, the man with the "security" shirt, later identified as [petitioner], asked what time the bank closed. Prasad found the question unusual, because the bank hours were posted on the door in the area the two men had been looking. While the two men waited in the teller line, they were stared at by Prasad and the three tellers, who had been alerted to their presence. Prasad said it was "suspicious" that the men left the bank without doing a transaction. Prasad followed the two men after they left the bank and eventually lost sight of them. He thought it was "unusual" that the men did not go to a car in the bank parking lot.

Police detained defendants near the bank parking lot. [Petitioner] was carrying a rolled up blue t-shirt with "security" written on it and a "soft-type" hat. A consensual pat search of [petitioner] turned up a clear baggie with 12 wrapped smaller baggies containing marijuana and two .32-caliber hollow tip bullets. Nothing was recovered in a consensual pat search of Burtley. A 2000 Pontiac Grand Prix registered to [petitioner] was recovered across the street from the Palo Alto bank and impounded. A search of the car turned up a red Marlboro fanny pack containing Dahl's passport and checkbook.

Defendants were separately transported to the police station where they were placed together in an interview room. On a hidden camera, [petitioner] was

---

[4] All references to "defendants" in the Court of Appeal's opinion are to petitioner and his co-defendant, Jeffrey Burtley.

4

observed pulling a gun from his pants and placing it under an acoustic wall panel. Police then entered the interview room, recovered the gun and searched [petitioner] again, who was wearing two layers of clothing. Pacis later identified the gun recovered from [petitioner] as the gun used during the robbery of the San Mateo bank.

As part of his investigation of the San Mateo bank robbery, San Mateo Police Sergeant Malcolm Laner was informed that a 1999 Ford Mustang convertible was registered to Burtley. On August 7, 2003, he went to the courthouse where the preliminary hearing was to take place, and located a red Mustang convertible in the courthouse parking lot. A check of the car's license plate revealed it was registered to Burtley, and the car matched the descriptions given by Caropepe and Kerns of the car seen in the bank parking lot following the bank robbery.

The thrust of the defense was mistaken identification.

Wilson, 2007 WL 2751877 at *1-4 (Cal. Ct. App. Sept 21, 2007) (internal footnote re-numbered).

## III. DISCUSSION

A. <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." <u>Penry v. Johnson</u>, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if

5

it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, the only state court to address the merits of petitioner's claims was the California Court of Appeal on direct review. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.   Petitioner's Claims

Petitioner claims his conviction and sentence are invalid because: (1) the trial court erred in admitting profile evidence; and (2) the trial court erroneously denied petitioner's Batson/Wheeler motion. The Court addresses each claim in turn.

1.   Profile Evidence

Petitioner claims the testimony of Palo Alto bank manager David Prasad ("Prasad")

6

constituted inadmissible "profile evidence." (Petition at 6.)

### a. Background

The California Court of Appeal summarized the factual and procedural background for this claim as follows:

> ***Evidence Code Section 402 Hearing***
>
> At an Evidence Code section 402 hearing, Prasad testified about training he received in recognizing potential bank robbers. He explained that on a quarterly basis he was required to watch videos regarding identification of bank robbers, check fraud or "anything that could happen within the bank." He was taught to notice his surroundings, to make eye contact and talk with someone who is loitering around the bank, and look out for anything unusual. Prasad said that based on his training, it was "really suspicious to have somebody come in, stand in line, and just walk outside of the door."
>
> Burtley's counsel argued that Prasad's training regarding identifying potential bank robbers was inadmissible profile evidence that could not be used to prove criminal conduct or criminal intent. Counsel also argued that the evidence was irrelevant and more prejudicial than probative. (Evid.Code, § 352.) The prosecutor argued the challenged evidence was relevant because it explained why Prasad notified police about the suspects. [Petitioner's] counsel argued that Prasad could not offer an opinion that the men were "casing" the bank, but could describe their conduct.
>
> The court concluded that Prasad could not "speculate ... or offer opinions with regard to mental states of the two individuals [he] saw," but could describe what he observed as a percipient witness. The court said it would not make a blanket ruling regarding the term "casing" and noted that counsel reserved the right to object when Prasad testified.
>
> ***Prasad's Trial Testimony***
>
> At trial, Prasad testified he was taught "if somebody's just kind of moping around the branch, just not doing anything, kind of looking inside, that just causes some suspicion in us on why they just are, you know, sitting around. [¶] We've always been taught if there is something we are suspicious of [we should] go ahead and make eye contact with the person. Most likely at this point if we are making eye contact, the person won't really look into your eyes and they won't really talk to you about much." He described his training as "[b]asically on a quarterly basis we watch videos and have [a] meeting around, ... what to look for." Prasad said that at the time he went outside to contact the two men, he was aware only that the San Mateo bank had been robbed by two men, but did not know what they looked like.

<u>Wilson</u>, 2007 WL 2751877, *8-9 (Cal. Ct. App. Sept 21, 2007).

### b. Analysis

Petitioner presents his claim in the instant petition by referencing his petition for

7

1 review filed in the California Supreme Court.  In said petition for review, petitioner claimed
2 Prasad's testimony was (1) inadmissible profile evidence, in violation of People v. Robbie,
3 92 Cal. App. 4th 1075, 1084 (2001) and other California case law; and (2) unduly prejudicial
4 in violation of People v. Watson, 46 Cal. 2d 818, 837 (1956).  (See Ex. 6 at 7-9.)  Petitioner
5 raises no new arguments here.

6       Under AEDPA, this Court may entertain a petition for habeas relief on behalf of a
7 prisoner "only on the ground that he is in custody in violation of the Constitution or laws or
8 treaties of the United States."  28 U.S.C. § 2254(a).  The admission of evidence is not subject
9 to federal habeas review unless a specific constitutional guarantee is violated or the error is
10 of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due
11 process.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784
12 F.2d 984, 990 (9th Cir. 1986).

13       Here, petitioner does not refer to any federal law or constitutional provision with
14 respect to his profile evidence claim.  Instead, petitioner alleges error under state law only.
15 "[It] is not the  province of a federal habeas court to reexamine state-court determinations on
16 state-law questions.  In conducting habeas review, a federal court is limited to deciding
17 whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle
18 v. McGuire, 502 U.S. 62, 67-68 (1991); see also Aponte v. Gomez, 993 F.2d 705, 707 (9th
19 Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal
20 statutes").

21       Further, even assuming admission of Prasad's testimony was error, any such error did
22 not constitute a denial of due process.  The due process inquiry in federal habeas review is
23 whether "the admission of the evidence was arbitrary or so prejudicial that it rendered the
24 trial fundamentally unfair."  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley,
25 784 F.2d at 990.  The admission violates due process "only if there are *no* permissible
26 inferences the jury may draw from the evidence."  Jammal v. Van de Kamp, 926 F.2d 918,
27 920 (9th Cir. 1991) (emphasis in original).  Here, the California Court of Appeal found the
28 testimony regarding Prasad's training was relevant and admissible to explain why Prasad was

8

1 particularly attentive to petitioner's conduct, thereby reinforcing the accuracy of Prasad's
2 observations. Wilson, 2007 WL 2751877 at *10. The Court of Appeal also found Prasad's
3 testimony relevant and admissible under California Evidence Code § 1101(b), in that it
4 served to show the identity of the San Mateo bank robbers, who were wearing clothing nearly
5 identical to that worn by the two individuals Prasad observed acting in a suspicious manner
6 at the Palo Alto bank. Id. The inferences identified by the state court are clearly permissible,
7 and, consequently, the admission of Prasad's testimony did not violate due process.

Accordingly, petitioner is not entitled to habeas relief on this claim.

2. Batson/Wheeler Motion

During jury selection, the prosecutor exercised peremptory challenges against two prospective African-American jurors. (Ex. 3 at 307.) Petitioner and his co-defendant, Burtley, both of whom are African-American, made a joint Batson/Wheeler motion.[5] (Id. at 308-10.) After finding the defendants had made out a prima facie case of purposeful discrimination, the trial court denied the motion, further finding there were race-neutral justifications for the peremptory challenges. (Id. at 313-14, 319-20.) Petitioner claims the denial of the motion was erroneous. (Petition at 6.)

a. Background

The California Court of Appeal summarized and resolved this claim as follows:

Prospective Juror L.L.

L.L. was in the first group of jurors called to the jury box. During voir dire by the court, L.L. stated that nothing about her prior jury service would make it difficult to serve in this case and said there was no reason she could not be fair. L.L. said she was married, had two grown children, was a high school math tutor, her husband was a truck driver, no one in her household had legal training and she had no friends involved in criminal law. L.L. said that two years before she was a juror on a "drug-related" case in San Mateo County. She said, "the guy felt that he had been set up by the police." Subsequently, the prosecutor asked if any of the prospective jurors felt sympathy that would interfere with their ability to be a fair and impartial juror. In response, L.L. volunteered, "By being an African-American and they are African-American, I have no problem with it." After the prosecutor asked whether anyone

---

[5] Batson v. Kentucky, 476 U.S. 79, 89 (1986); People v. Wheeler, 22 Cal. 3d 258, 280 (1978).

disagreed with the concept that "just because there is some conflicting evidence that in and of itself does not create reasonable doubt," the following colloquy occurred:

"[L.L.]: I think it could possibly cause some confusion.

"[Prosecutor]: But you understand you have to evaluate all of the evidence; is that correct?

"[L.L.]: Exactly."

The prosecutor's sixth peremptory challenge was to L.L. At the time L.L. was challenged, counsel for defendants had peremptorily challenged five prospective jurors.

### *Prospective Juror S.B.*

When prospective Juror S.B. was called to the jury box, he asked to be excused for hardship. He explained his hardship was, "Both business and financial. From a business standpoint, I have a lot of deliverables and deadlines which still have to be met. So if I serve on the jury, I still have to probably go into the office and work after hours and on weekends, get projects done." S.B. explained he did financial accounting work for Hewlett-Packard and acknowledged he would not lose income as a result of his jury service. S.B. also said he was concerned that if he was on a jury panel for two weeks it would jeopardize his opportunity to interview for a position with a new company. S.B. said the interview had not yet been scheduled, but would probably occur within the next week. After he acknowledged that the prospective employer would "potentially" be willing to reschedule the interview due to his jury service, the court denied S.B.'s hardship request.

S.B. then stated he was single, had no children, lived alone and had no friends or relatives involved with law enforcement or criminal law. He also said there was no reason he could not be fair and impartial. Subsequently, in response to questioning by the prosecutor, S.B. said he would be "pretty unhappy" if he got called for the interview and the company was unwilling to reschedule it. However, he answered "no" when asked if he would hold it against the prosecutor or the defense, S.B. said, "I think if I explain my circumstances, if they want me bad enough, they will probably let me come in at another time. That's my true feelings. [¶] ... So I think we could probably work something out maybe even after hours ..." He reiterated that even if he was sitting on a jury, his work still needed to get done, nobody else could do it, and he would have to work weekends or after hours. When asked if he "will be okay with the course of the trial," S.B. answered, "Sure." Thereafter, the prosecutor exercised his thirteenth peremptory challenge against S.B. and defense counsel made their joint *Batson-Wheeler* motion.

In asserting the *Batson-Wheeler* motion, the defense argued that out of the nearly 100 people in the jury panels, only three were African-American, including L.L. and S.B. The court noted that following the challenges to L.L. and S.B., one African-American remained on the jury panel. Thereafter, it found that a prima facie case had been established and asked the prosecutor to explain its peremptory challenges to L.L. and S.B.

10

The prosecutor gave the following justification for challenging L.L.: "First, as to [L.L.], ... beginning initially with in-court conduct, I noticed upon-shortly upon her entry at certain points during the voir dire process before I questioned her I did notice her staring at me on several occasions which was what initially drew my attention to her. [¶] Upon my voir dire, when I addressed the entire panel and asked the question if there was any reason I might be held to a higher burden by any members of the jury, including sympathy, she immediately upon her response when I asked her if there was any higher reasoning became defensive. As it sounded to me on the record that she would not sympathize with the defendants because they were African-American, making an assumption it was a race-motivated question asked by the People or at least that's how it seemed. And she did seem somewhat annoyed with me with her facial expressions after that particular question was asked. [¶] I also noted and was referred to me by Detective or Sergeant Cabral was that I asked the juror next to her who was Ms. [B.] and the rest of the venire a question about being able to resolve the conflicts in the evidence in the case, and if they felt--one if they understood that conflicts in the evidence did not in and of themselves create reasonable doubt. Ms. [B.] seemed to have a problem with that. And at the same time, [L.L.] was nodding her head in agreement with that, which is something that Sergeant Cabral noticed as well. [¶] At the end of the day in the exercise of peremptories, I did not further voir dire her anymore yesterday and did not--I passed on her at this point. [¶] When I came back in here this morning I noticed her body language directed towards me. She did seem to focus on me at least a little bit. Based upon that, I felt she might harbor some ill will towards me because of my question, if my question offended her, and if she might hold that against me personally and against the prosecution of the case. Those are my reasons as to [L.L.]."

The prosecutor gave the following justification for challenging S.B.: "As to [S.B.], I think the record is very clear [S.B.] started out by asking to be excused for hardship, which the court denied. He stated he had numerous business obligations and was going to be working late after work just at the hardship stage, and additionally that he had a potential job interview that was available to him that was [possibly] going to be missed if he had to serve on a jury over the next two weeks. He brought that up to the court. The court denied the hardship challenge. [¶] I then asked him on voir dire specifically about that particular issue. Are you going to be upset if you miss that opportunity, and he said yes, I'm not going to be happy if that's the case. He did comment that if they wanted him badly enough they would reschedule, but the fact that he could potentially [lose] a job interview for a higher paying job is obviously a matter of concern. Coupled with the fact that he indicated that he was going to continue to work late after trial as well as on the weekends additionally I feel met the criteria to strike him as a [juror] in this particular case. I have also struck other ... [¶] ... jurors for the same basis. In terms of having contrary concerns that will be distractions to them over the ... same reason why I struck Mrs. [S.] based upon her repeated issues with having to be away from her children, not being able to take care of her, being distracted about issues with her, same situation with Ms. [D.] and Mr. [W.] as well as the house sale." The prosecutor also noted that he had passed for challenge another African-American prospective juror.

Burtley's counsel responded that S.B. was "quite clear ... that he was more than willing to have the people he wanted to potentially interview him reschedule ... [H]e showed a willingness and readiness to serve and no frustration or temper tantrums. The court stated, "I think fairly speaking, after sometime he did

11

warm to the idea of possibly serving as a juror where he was a little bit more resistant to the concept at the beginning of his voir dire."

With regard to L.L., Burtley's counsel stated, "I mean she was staring at us too. They are sitting up there. Here we are. They are kind of a captive audience. I'm not sure they are staring at me is a substantial reason to kick her off the jury."

[Petitioner's] counsel stated he did not perceive that the prosecutor "did anything wrong and singled anybody out. And I didn't get those same feelings or reactions from [L.L.] or [S.B.]" He noted there were a number of professionals on the jury that would rather be at work, and he did not understand the justification for the prosecutors challenges of L.L. and S.B.

The prosecutor responded that L.L. seemed to be offended by his question and responded defensively to it, and he was concerned she would hold it against him in the course of trial. He added that L.L.'s body language "solidified" his concerns. As to S.B. the prosecutor said that S.B.'s statement that he would not be happy if he did not get the job coupled with his having to work after hours and weekends gave the prosecutor concern that S.B. would be distracted with things other than trial, particularly if he were working late at night.

In denying the *Batson-Wheeler* motion the court stated that although it was "somewhat troubled," and therefore found a prima facie case had been established, it concluded there was a reasonable neutral explanation for the prosecutor's challenges of L.L. and S.B. and no purposeful discrimination had been shown.

The trial court's ruling on the issue of purposeful racial discrimination is reviewed for substantial evidence. (*Avila*, *supra*, 38 Cal.4th at p. 541.) The prosecutor is presumed to use peremptory challenges in a constitutional manner and deference is given to the court's ability to distinguish "'bona fide reasons from sham excuses.' [Citation.]" (*Ibid.*) The prosecutor may exercise a peremptory challenge for any permissible reason, or for no reason at all, but if he or she provides an "'implausible or fantastic' [citation]" justification for a challenged strike, the court may determine the justification is a pretext for purposeful discrimination. (*People v. Huggins* (2006) 38 Cal.4th 175, 227.) We defer to the court's conclusions so long as it makes a "'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.]" (*Avila*, *supra* at p. 541.) "'[I]n fulfilling [this] obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's [nondiscriminatory] reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's [nondiscriminatory] reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom.'" (*People v. Ward* (2005) 36 Cal.4th 186, 200, quoting *People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

Defendants contend the court's finding that the prosecutor had race neutral reasons in support of his challenges of L.L. and S.B. is not supported by substantial evidence. As to the prosecutor's justification that L.L. was annoyed with him, [petitioner] argues, in essence, that the prosecutor provoked L.L.'s annoyance by posing a question that put her "on the spot," rendering the prosecutor's justification illusory. Defendants both argue there is no evidence

12

in the record that L.L. expressed any disagreement with the concept that conflicting evidence does not alone create reasonable doubt, and there is no evidence that L.L. projected any animosity toward the prosecutor. [Petitioner] argues that the prosecutor's reliance on L.L.'s body language should be given less weight.

"Since the trial court was in the best position to observe [L.L.'s] demeanor and the manner in which the prosecutor exercised his peremptory challenges, the implied finding, that the prosecutor's reasons for excusing [L.L.], including the demeanor-based reason[s], were sincere and genuine, is entitled to 'great deference' on appeal. [Citations.]" (*People v. Reynoso*, *supra*, 31 Cal.4th at p. 926; *People v. Stanley* (2006) 39 Cal.4th 913, 939.) While the cold record before us does not affirmatively disclose L.L.'s asserted defensiveness, annoyance, or body language, it is not contradicted by the record. Thus, we may rely on the presumption that the prosecutor properly relied on these reasons. (*See People v. Allen* (2004) 115 Cal.App.4th 542, 549.)

Burtley argues that the record provides no basis for the prosecutor's striking S.B. on the ground that S.B. was unwilling to serve on the jury due to work commitments or a prospective job interview. [Petitioner] argues that the fact that the prosecutor did not peremptorily challenge Juror No. 3 whose hardship request was denied renders insufficient the prosecutor's justification for challenging S.B. Assuming, without deciding, that a comparative juror analysis should be conducted for the first time on appeal (*see*, *e.g.*, *People v. Williams*, (2006) 40 Cal.4th 287, 312; *Avila*, *supra*, 38 Cal.4th at p. 546; *People v. Huggins*, *supra*, 38 Cal.4th at p. 232; *People v. Jurado* (2006) 38 Cal.4th 72, 105; *People v. Schmeck* (2005) 37 Cal.4th 240, 270; *People v. Gray* (2005) 37 Cal.4th 168, 189-190; *People v. Cornwell* (2005) 37 Cal.4th 50, 71), we conclude it is unavailing.

The prosecutor's justification was not that S.B. was unwilling to serve on the jury, but that S.B.'s statement that he would not be happy if he did not get the job coupled with his having to work after hours and weekends gave the prosecutor concern that S.B. would be distracted with things other than trial, particularly if he were working late at night. This is a perfectly reasonable inference from S.B.'s statements and a proper justification for the prosecutor's challenge.

We also reject [petitioner's] attempt at comparative juror analysis to establish that the prosecutor's explanation for challenging S.B. was a sham. (*See*, *e.g.*, *Miller-El v. Dretke* (2005) 545 U.S. 231, 240-248; *Avila*, *supra*, 38 Cal.4th at ¶. 545-546.) Juror No. 3, a clinical nurse case manager, stated that if she were not at work, it would be very difficult for others in her office to absorb her work duties. Juror No. 3 also stated that she was divorced and responsible for transporting her 17-year-old son to and from high school on certain days. Juror No. 3's responses to voir dire questions revealed her circumstances and reasons for requesting to be excused for hardship were different from S.B.'s and therefore comparative juror analysis does not tend to show prohibited group bias. The trial court was in the best position to evaluate the jurors and the prosecutor's justification for challenging S.B. and found that justification legitimate. On the record before us, we have no reason to reach a different conclusion. Defendants' *Batson-Wheeler* motion was properly denied.

Wilson, 2007 WL 2751877 at *4-8 (Cal. Ct. App. Sept. 21, 2007).

13

b.     Analysis

The Equal Protection Clause forbids peremptory challenges of "potential jurors solely on account of their race." Batson, 476 U.S. at 89.  A violation of equal protection under Batson is established in a three-step process: (1) the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) if a prima facie case is established, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; and (3) if the prosecutor comes forward with a race-neutral explanation, the trial court must determine whether the opponent of the strike has proved purposeful discrimination.  Johnson v. California, 545 U.S. 162, 168 (2005).

A federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  Hernandez v. New York, 500 U.S. 352, 359 (1991).

Where the prosecution comes forward with an explanation of racial neutrality, proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  See Hernandez, 500 U.S. at 355-62.  Such a finding turns largely on the trial court's evaluation of the prosecutor's credibility, Rice v. Collins, 546 U.S. 333, 340-42 (2006).  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel.  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004).  A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection."  Purkett v. Elem, 514 U.S. 765, 769 (1995).  What matters is the "*genuineness* of the motive" behind the racially-neutral explanation, not "the *reasonableness* of the asserted nonracial motive."  Id. (emphasis in original).  "'To accept a prosecutor's

14

stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" Gaston v. Curry, 406 Fed. App'x. 144, 145 (9th Cir. 2010) (quoting Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir. 2006)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings'" and "'demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (quoting Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see Elem, 514 U.S. at 769, as are the findings of the state appellate court, see Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means a state court's findings with respect to discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. Miller-El v. Dretke, 545 U.S. 231, 240 (2005). "'[The federal court] must defer to the [state court's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Gaston, 406 Fed. App'x. at 145 (quoting Cook v. LaMarque, 593 F.3d 810, 816 (9th Cir. 2010)). A federal habeas court may grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the Batson challenge." Rice, 546 U.S. at 338-41.

Applying these legal principles to the instant matter, the Court concludes petitioner has failed to rebut the presumption that the state court's conclusion was a reasonable one. See Miller-El, 545 U.S. at 240.[6]

In particular, the record does not support petitioner's assertion that the prosecutor's decision was based on unconstitutional considerations. As to L.L., the prosecutor, as noted,

---

[6] The Court need not address herein the first step of the Batson analysis, specifically, whether petitioner made out a prima facie case of discrimination, as the prosecutor went forward and offered race-neutral explanations for striking the jurors and the trial court ruled on the ultimate question of intentional discrimination. See Hernandez, 500 U.S. at 359.

15

explained that said juror appeared annoyed and hostile toward him as indicated by her body language and responses to his questions during voir dire. There is nothing in the record contradicting the prosecutor's assessment of L.L.'s demeanor. Indeed, petitioner essentially acknowledges L.L.'s apparent annoyance by arguing the prosecutor provoked such response by "put[ting] her 'on the spot.'" See Wilson WL 2751877 at *7. Irrespective of whether L.L. was put "on the spot," however, there was nothing improper in the prosecutor's inquiry, and "race-neutral reasons for peremptory challenges often invoke a juror's demeanor." See Snyder v. Louisiana, 552 U.S. 472, 477 (2008); see also Thaler v. Haynes, 130 S. Ct. 1171, 1172 (2010) (accepting demeanor-based explanation for peremptory challenge where prosecutor asserted prospective juror's body language showed failure to take case seriously); Briggs v. Grounds, 682 F.3d 1165, 1178 (9th Cir. 2012) (accepting, as race-neutral reason for challenge, prosecutor's statement that prospective juror was evasive and flippant in his answers).

    As to S.B., as the prosecutor explained, said juror was concerned about losing a potential job interview as a result of serving on the jury and that he would have to work after hours and on weekends during the trial. As the Court of Appeal found, such concerns on the part of S.B. gave the prosecutor reason to believe said juror would be distracted during the trial. Further, the prosecutor also challenged two other jurors who, similar to S.B., unsuccessfully requested to be excused for hardship and appeared likely to be preoccupied with or distracted by those concerns. (See Ex. 3 at 214, 226, 232-33, 247, 262-63, 302-05.)

    In sum, petitioner has not come forward with clear and convincing evidence to rebut the presumption that the trial court's determination was correct, nor has he otherwise shown why this Court should accept his interpretation of the record over the trial court's credibility determination.

    Accordingly, petitioner is not entitled to habeas relief on this claim.

//
//
//

C. <u>Certificate of Appealability</u>

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. <u>See</u> Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. <u>Id.</u> § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Gary Swarthout on the docket as the respondent in this action.

IT IS SO ORDERED.

DATED: February 15, 2013

MAXINE M. CHESNEY
United States District Judge